Filed 12/31/24  P. v. Beloy CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>JOSHUA M. BELOY,<br><br>    Defendant and Appellant. | A168607<br><br>(City and County of San Francisco Super. Ct. No. SCN231199) |

Joshua M. Beloy is serving a sentence of 36 years to life after a jury convicted him of nine felony offenses and one misdemeanor offense related to an incident where he burglarized the home of his ex-girlfriend, C.T., and raped her three times.  On appeal, Beloy challenges his burglary and rape convictions, and raises one sentencing claim of error.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*General Background*

Beloy and C.T. began dating in 2010.  In 2016, Beloy and his two daughters moved into C.T.'s house, which she had owned solely in her name since 2009.

Around the time Beloy moved in, C.T. and Beloy executed a one-year term lease (with C.T. as lessor and Beloy as lessee) to enable Beloy to enroll his daughters in the local school district.  Not long thereafter, in early 2017,

1

C.T. told Beloy she did not want to be with him any longer but would allow him and his daughters to stay in the house until the summer of 2017. Beloy did not leave that summer and, in November 2017, C.T. handed him an eviction notice. Beloy still did not move out, and they ultimately agreed he could stay until the summer of 2018 so his daughters could finish the academic school year.

In January 2018, C.T. and Beloy got into an argument, the details of which the parties dispute. As a result, C.T. moved out and stayed at a friend's house, still with the understanding that Beloy would move out in the summer. Indeed, in July 2018 Beloy moved most of his belongings to a storage unit and went to stay with a friend. When he moved out, C.T. went on a trip and had the locks changed on her house while she was away; she moved back into her home at the end of July 2018.

In the early evening on August 8, 2018, Beloy broke a window in C.T.'s home with a brick, opened the door, and entered. C.T. locked herself in her bedroom. Beloy kicked open the bedroom door and a physical and verbal altercation ensued. C.T. averred Beloy raped her three times, while Beloy stated they had sex only once, consensually. The next day, August 9, C.T. went to the hospital with extensive bruising and reported she had been attacked and raped by Beloy.

*Charges*

In 2023, Beloy was charged by information with 10 counts: first degree residential burglary (Pen. Code, § 459[1]; count 1); three counts of rape by force or violence or by threat of bodily injury (§ 261, subd. (a)(2); counts 2, 3, & 4); domestic violence (§ 273.5, subd. (a); count 5); assault with force likely to cause great bodily injury (§ 245, subd. (a)(4); count 6); false imprisonment

---

[1] All further statutory references are to the Penal Code.

(§ 236; count 7); dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 8); vandalism of more than $400 (§ 594, subd. (b)(1); count 9); and misdemeanor annoying telephone calls (§ 653m, subd. (b); count 10).

The information alleged the first degree burglary (count 1) occurred when C.T. was present in the residence. (§ 667.5, subd. (c)(21).) It alleged all three rapes (counts 2, 3, & 4) occurred during the commission of a burglary (§ 667.61, subd. (e)(2)) and involved great bodily injury inflicted upon C.T. within the meaning of both sections 667.61, subdivision (d)(6) and 12022.8. It also contained great bodily injury allegations (§ 12022.7, subd. (e)) as to the domestic violence and assault charges (respectively, counts 5 and 6).

The information further alleged as aggravating sentencing factors that counts 2 through 6 involved great violence or great bodily harm (Cal. Rules of Court, rule 4.421(a)(1)), and, as to counts 1 through 8, that C.T. was a particularly vulnerable victim (*id.*, rule 4.421(a)(3)).[2]

*Jury Trial Proceedings*

A jury trial took place in March 2023. As relevant to this appeal, the following testimony and evidence was presented.

*C.T.'s Testimony*

C.T. testified she bought her home in San Francisco in 2009. She first dated Beloy from 2010 until 2015, when they decided to take a break for a few months. They then resumed dating, and Beloy and his two daughters moved from Hayward into C.T.'s house. Around that time, on May 27, 2016, C.T. and Beloy entered into a lease agreement so that Beloy's daughters could enroll in San Francisco schools. The lease was from June 1, 2016 through June 1, 2017, at which point the tenancy would convert to month-to-

---

[2] Other circumstances in aggravation alleged in the information were later dismissed on motion of the prosecution.

month and could be terminated by either party with 30 days' written notice. The lease stated Beloy would pay C.T. $800 a month in rent, but he never actually paid rent while living there.

In January 2017, C.T. discovered Beloy was cheating on her and confronted him. C.T. told him she did not want to be with him and wanted him to move out. Because Beloy's daughters were in the middle of the school year, she agreed to let them live at her house through the end of the 2017 school year. She and Beloy were not in a relationship during that time.

In the summer of 2017, Beloy's daughters went to stay with their grandmother, but Beloy remained in C.T.'s house against her wishes. When she asked when he was going to move out, they would argue, and he remained at her house during the summer without her permission. She could not physically force him to leave so she contacted a legal service provider to learn about the eviction process. Beloy's daughters moved back into her house at the end of summer and began the new school year.

C.T. wanted to evict Beloy because their living situation was toxic and involved physical abuse; she was scared to go home at times. In November 2017, she handed Beloy an eviction notice entitled "60-Day Notice of Termination of Tenancy." Beloy ripped it up and did not move out. Beloy eventually convinced C.T. to let him and his daughters stay until the end of the 2018 school year so they could finish school.

Unless otherwise indicated, all further dates refer to 2018.

In January, C.T. and Beloy got into a fight. Beloy got mad that C.T. did not respond to him calling her name, then poured three cups of water on her as she was sitting on the couch. He dragged her into the bedroom as she fought against him and forced her to have sex with him. C.T. did not report it because she was scared.

4

After that incident, C.T. lived at a friend's house until July with the expectation that Beloy would move out after the school year ended. C.T. maintained some contact with Beloy throughout that time, including helping him look for a new place to live and going to his daughter's graduation, but they did not see each other much.

After the school year ended, Beloy moved his daughters and their belongings to their grandmother's house. In July, Beloy started moving his belongings out of C.T.'s house. He sent her a text message saying he had moved out, which she confirmed by going to the house. One day later, Beloy went to C.T.'s house to get the last of his items. Beloy told her he had forgotten his keys, so she did not ask him to return them. Instead, and because he had not returned her keys, C.T. had her parents change the locks to her house while she was on a trip. When C.T. got back from her trip in the last week of July, she moved back into her house. Beloy no longer lived there.

On August 5, Beloy texted C.T. about two items he had left at her house, which he asked her not to throw out. He also asked about the status of their relationship. C.T. responded that she did not want to be with him. Beloy replied with a series of threatening and insulting text messages stating he would "ruin [her] life," including by telling her parents and coworkers disparaging information about her personal and sex life. Beloy also sent partially nude photos of her and videos of them having sex, which she did not know he had taken. C.T. was terrified and did not know what to do, so she did nothing in response. The text messages were admitted into evidence.

On August 8, C.T. arrived at her home around 6:30 p.m. She soon heard someone coming up her back steps and knocking hard on the back door. C.T. knew it was Beloy and texted him that she was going to call the

5

police.  After C.T. sent that text message, she heard Beloy saying, " 'Let me in,' " to which C.T. replied " 'Stop.' "  C.T. then locked herself in her bedroom and dialed 911.

C.T. heard the glass on the back door breaking and Beloy trying to get in.  As she was dialing 911, Beloy entered the house and kicked open the door to the bedroom where C.T. had locked herself inside.  He grabbed her phone and hung up the 911 call before she could hear whether a 911 operator picked up.

Surveillance footage was played at trial showing Beloy outside C.T.'s house; the footage contained loud noises, which C.T. identified as glass breaking, banging on her door, screaming, yelling, and arguing.  A transcript of the footage, which C.T. testified accurately reflected what she heard on the video to the best of her ability, reflected C.T. saying: "I'm gonna call the cops. I'm gonna call cops.  [Loud banging sounds].  Stop!  No!  Get off me!  Stop! Stop!"

C.T. twice tried to leave the bedroom.  The first time, Beloy picked her up and brought her back to the room before yelling at her.  The second time, C.T. tried to run out of the room but Beloy went after her, picked her up, and threw her back on the bed before closing the door and standing in front of it.

Throughout the night, Beloy yelled at C.T., hit her face, slapped her, and pushed her head, arms, legs, side, thighs, and butt.  At times, he pushed her head against the wall or down on the floor.  There were breaks in between the hitting and yelling when Beloy calmed down and apologized, talking about wanting to be together again, but the yelling and hitting then returned, and that cycle repeated through the night from around 7:00 p.m. until 1:00 a.m.  C.T. tried to call out for help but no one came, and Beloy sought to prevent her from doing so by pushing her chin up, choking her, and

putting her in a choke hold. She fought back as hard as she could to keep from passing out. Beloy also damaged C.T.'s property by throwing jam and condiments all over her room, stepping on her laptop and breaking it over his knee, and ripping up her passport and throwing it in the toilet. C.T. suffered bruising on her face, neck, arms, and wrists. Beloy also caused floaters (specks in field of vision) in her eyes that lasted for about a year.

C.T. testified that Beloy raped her three times that night. The first rape took place about one to two hours after Beloy entered the house. Beloy pinned C.T.'s arms down, pinned her on the bed, pulled her clothes off, and forced her to have sex with him, penetrating her vagina with his penis for about 20 to 30 minutes. She screamed and tried to push him off her but was unable to do so, so she lay there crying until it was over. The second rape occurred about two or three hours after the first rape. Beloy again pinned her down and forced her to have sex with him by inserting his penis into her vagina for about 30 to 40 minutes. During that incident, he took out his camera to record them having sex, propping it up so it would be out of C.T.'s reach. The third rape occurred sometime between 2:00 a.m. and 6:00 a.m. when C.T. was either sleeping or trying to fall asleep; he again held her down and inserted his penis in her vagina for 20 to 30 minutes.

C.T. was eventually able to fall asleep and woke up to her alarm between 6:00 a.m. and 8:00 a.m. At that time, Beloy went to move his car and C.T.'s car because of street cleaning. C.T. did not call for help as her phone was broken. She did not leave because she did not have clothes on, her keys, or a working phone, and was scared to leave. Beloy came back into the house and C.T. went back to sleep.

C.T. next awoke when she heard her brother calling her name from outside the back door. She woke Beloy up and told him he had to leave

through the front door because she knew if her brother saw her bruised and beaten while Beloy was there "anything could happen," such as Beloy and her brother getting into a fight. C.T.'s brother came into her bedroom and asked if Beloy "did this to [her]"; she responded yes. At first, she did not tell him Beloy had raped her because she was embarrassed and scared, but she later told him.

C.T.'s brother called the police, who arrived shortly after. When an officer interviewed C.T., she told the officer she had not been raped because she was scared and "just wanted this to be over." C.T. was taken to the hospital, where she disclosed to a nurse and other police officers that she had been raped. C.T. underwent a sexual assault exam at the hospital.

*Sexual Assault Exam Testimony*

The forensic nurse practitioner who examined C.T., Lucretia Bolin, testified that she remembered the exam due to the extent of C.T.'s injuries. C.T. reported to Bolin that she had been punched on her face, head, buttock, and thighs, slapped, choked, and raped. C.T. had numerous injuries, including black eyes, an abrasion on her lip, and bruising on her face, neck, jawline, chest, arm, buttock, thigh, knee, and shins.

The sexual assault exam did not reveal vaginal injuries. Bolin testified rape "more often than not" does not result in vaginal injury. A vaginal swab sample taken during the exam contained DNA that was 138 octillion times more likely to have originated from Beloy rather than an unrelated person.

*Beloy's Testimony*

Beloy testified in his own defense. He stated he signed the lease with C.T. in 2016 when he and C.T. decided to live together with his daughters. He used C.T.'s house for registering himself and his daughters in school, as

8

well as for his car registration and insurance. He had keys to the house, which C.T. never asked him to return.

In January 2017, C.T. discovered Beloy was cheating on her and she asked him to move out. He did not move out because they made up a few days later and got back together as a couple. She would tell him to move out at times throughout 2017 but they would make up and C.T. did not "push the issue."

In November 2017, C.T. handed Beloy an eviction notice, but she never went through with the eviction process. They agreed he could stay so that his daughters could finish the school year.

As to the January 2018 incident, Beloy testified he did not pour water over C.T.; instead, he got upset and slammed a dehumidifier on the ground, which splashed water on her. He stated they did not have sex that evening. C.T. moved out of the house because of that incident but they continued to talk and text.

C.T. told Beloy they could work on their relationship if he moved out. In April through June, they went on dates, some of which included sex, and they looked for apartments for him. C.T. attended his daughter's graduation in June. In July, Beloy rented a storage unit and began packing up. In mid-July, C.T. was rushing him to move out because her parents were going to come by the house. Beloy told C.T. he would continue to stay at the house on nights that he drove Uber, and she had no problem with that.

When C.T. went on a trip at the end of July, Beloy stayed at a friend's house because she did not want him there while her parents were going to be in and out of the house. She did not ask for her keys back before she left. C.T. did not reach out to Beloy when she got back from her trip, and he did not know she had changed the locks. At that time, she told him she did not

want to be with him. That made him angry and he sent a series of text messages to get her to respond to him (the threatening text messages previously admitted into evidence).

On August 8, Beloy sent C.T. an email apologizing for the threats and saying he would not do anything malicious. That day, he went to the gym to "blow[] off some steam" because he was upset. He then went to San Francisco and did a couple of rides working for Uber. Beloy wound up near C.T.'s house so he decided to stop by the house for a quick break. He did not know if C.T. would be there but planned to confront her about their relationship status if she was there.

When Beloy approached the back door, he discovered his key did not work, which made him angry. When there was no answer to his knocking, he picked up a brick and used it to break the glass on the door. Beloy reached in and unlocked the door. After C.T. texted him she was going to call the police, he kicked the bedroom door open, grabbed her wrist, took the phone out of her hand, and started yelling.

C.T. told Beloy she did not know her parents were going to change the locks and repeatedly apologized to him for " 'being a bitch.' " They had a long argument, during which C.T. told him they could work things out and Beloy read aloud his apology email, as she had not read it. After he read the email, the dynamic shifted and they began lying together in bed while holding each other. They talked about proceeding with their relationship and began kissing before having sex—for the first and only time that night. Beloy believed they had made up at that point.

After they had sex, Beloy got angry when C.T. would not let him see her phone, so he proceeded to rip up her passport, splatter jam on the wall, and break her laptop. Beloy then snatched her phone away and C.T. lunged

10

at him while he was trying to read her text messages.  He pushed her very hard at that point, causing her to fall or hit something in the room.

Beloy read C.T.'s text messages and discovered she was talking to another man, leading to more arguing and physical fighting, including C.T. punching and slapping Beloy, and Beloy covering C.T.'s mouth, pushing her hard, punching her in the leg, slapping her, and putting his finger in her eye. Beloy then apologized and after talking for another three hours they eventually went to sleep.

Beloy woke up when C.T.'s phone went off in the morning; he moved their cars and they went back to sleep.  Around 12:30 p.m., C.T. abruptly woke Beloy up when her brother was outside.  Beloy asked if they should explain the situation as they had made up at that point, but C.T. said he should leave through the front door.

On cross-examination, Beloy testified that he had moved out "most" of his belongings in July.  By the time of C.T.'s trip at the end of July, when he was staying with a friend, he was "pretty much" out of the house for all intents and purposes.

*Defense Closing Arguments*

In his closing argument, defense counsel presented the case as a "credibility contest" relating to counts 1 through 4, the burglary and three rape charges.  As to the burglary charge, he argued Beloy had an unconditional right to enter C.T.'s house based on the 2016 lease having converted to a month-to-month tenancy when it ended in June 2017 and that he was still in the process of moving out when the August 8 incident occurred.  The defense to the rapes was that Beloy and C.T. engaged in

11

consensual "makeup" sex, and only had sex once throughout the night. Beloy conceded guilt on all the remaining counts.[3]

*Jury Verdict*

The jury found Beloy guilty on all 10 counts. As to the rape convictions (counts 2, 3, & 4), the jury found true that the offenses were committed during the commission of a burglary (§ 667.61, subd. (e)(2)). The jury also found true the aggravating sentencing factor that the second rape (count 3) involved great violence or great bodily harm (Cal. Rules of Court, rule 4.421(a)(1)). However, for all three rape counts, the jury found not true the enhancement allegations that the rapes involved great bodily injury inflicted upon C.T. within the meaning of either section 667.61, subdivision (d)(6) or section 12022.8. The jury found true other enhancements and aggravating sentencing factors not relevant to this appeal.

*Sentencing Hearing*

On August 11, 2023, the trial court sentenced Beloy to an aggregate term of 36 years to life in prison. The sentence was comprised of a determinate term of six years on the domestic violence count (count 5) followed by consecutive terms of 15 years to life on the first two rape counts (counts 2 and 3), with the remaining sentences stayed or running concurrently. Beloy appealed.

## DISCUSSION

Beloy challenges his convictions and sentence on various grounds. First, he argues insufficient evidence supports his burglary conviction and the burglary enhancements to the rape counts. Second, he asserts testimony given by C.T., which the court had previously ordered to be excluded from

---

[3] Beloy continued to contest the enhancements on the conceded counts.

trial, prejudiced him.  Finally, he contends the court erred in imposing consecutive 15-year-to-life sentences on counts 2 and 3.  We shall affirm.

## I. Substantial Evidence Supports the Jury's Burglary Findings

Beloy contends substantial evidence does not support his burglary conviction and the jury's findings that the three rapes were committed during the commission of a burglary because he maintained an unconditional possessory interest in C.T.'s house when he entered on August 8.  We disagree.

### A.  Applicable Law

"The standard of appellate review for determining the sufficiency of the evidence is settled.  ' "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)  When reviewing the sufficiency of the evidence to support an enhancement, we use the same standard we apply to a conviction, presuming every fact in support of the judgment the jury could have reasonably deduced from the evidence. (*Ibid.*)  It is the exclusive province of the jury to determine witness credibility and resolve conflicting evidence. (*People v. Mumin* (2023) 15 Cal.5th 176, 202.)

Burglary is the entry into any building with the intent to commit a grand or petty larceny or any felony.  (§ 459.)  This definition retains two aspects of common law burglary: it "remains an entry which invades a possessory right in a building," and it "must be committed by a person who has no right to be in the building." (*People v. Gauze* (1975) 15 Cal.3d 709, 714 (*Gauze*).)

A person who has an "unconditional possessory right" to enter a structure cannot commit a burglary as he cannot intrude on his own possessory right. (*People v. Garcia* (2017) 17 Cal.App.5th 211, 223.) For example, in *Gauze*, the defendant was convicted of burglary after he quarreled with his roommate, entered their shared apartment, and fired a shotgun at the roommate. (*Gauze, supra*, 15 Cal.3d at p. 711.) The California Supreme Court reversed the burglary conviction, concluding the "defendant cannot be guilty of burglarizing his own home. His entry into the apartment, even for a felonious purpose, invaded no possessory right of habitation. . . . More importantly defendant had an absolute right to enter the apartment . . . that could not be conditioned on the consent of defendant's roommates." (*Id.* at pp. 714, 717.)

However, a person can "abandon[] his unconditional possessory interest in [a home] by moving out." (*People v. Ulloa* (2009) 180 Cal.App.4th 601, 609 (*Ulloa*).) In *Ulloa*, the court upheld a burglary conviction even though the defendant and his then-wife had a valid month-to-month lease in effect when he entered the home. (*Id.* at pp. 609–610.) The court reasoned that, "[e]ven assuming defendant had a possessory interest in the apartment under the lease at the time of the charged crimes, . . . there was substantial evidence he had moved out of the apartment prior to the crimes and therefore no longer had an unconditional possessory interest in the apartment unit." (*Id.* at pp. 606–607.) Abandonment of a possessory interest in a home finds even greater support where danger arises from a defendant's mere entry into his former home, for example when the occupants of the family home are estranged, there have been prior threats to the safety of the victim, and there are prior incidents of spousal abuse. (See *People v. Gill* (2008) 159 Cal.App.4th 149, 161 (*Gill*).)

14

## B.  Analysis

Beloy asserts he had an unconditional possessory interest in C.T.'s house on August 8 because there was no termination of the 2016 lease or completed eviction; there was an agreement he could stay at the house on nights he drove for Uber; he still had some possessions at the house; and C.T. never asked him to return his keys.  We are not convinced.

Here, as in *Ulloa*, even assuming Beloy had a possessory interest in C.T.'s house under the lease, we conclude there was substantial evidence he had moved out of C.T.'s house prior to August 8 and therefore no longer had an unconditional possessory interest in her house.  (*Ulloa, supra,* 180 Cal.App.4th at pp. 606–607.)  Both C.T. and Beloy testified that he had moved most of his belongings out of C.T.'s house before C.T. went on the trip at the end of July.  C.T. testified that she confirmed Beloy had moved out by going to the house.  While C.T. was on the trip, she had the locks changed, of which Beloy was unaware until he tried to enter on August 8.  When she returned from her trip at the end of July, C.T. moved back into her house; she testified that Beloy no longer lived there at that time.  The jury could reasonably deduce from this evidence that Beloy had moved out at the end of July.

Regarding Beloy's testimony that he could stay at the house on nights he worked for Uber, testimony the jury was free to discount, there was no evidence that he entered on August 8 because he was working as an Uber driver.  In any event, that potential agreement did not provide Beloy an "absolute right to enter" the house that could not be conditioned on C.T.'s consent.  (Cf. *Gauze, supra,* 15 Cal.3d at p. 714.)

Contrary to Beloy's assertion, this conclusion is not undermined by the fact that C.T. did not ask him to return her keys—keys which no longer

15

provided access to the house. Beloy relies on *Gill*, in which the court upheld a burglary conviction on the basis that the defendant waived his unconditional right to enter the family home by voluntarily leaving, giving up his house keys, and heeding his wife's directives to stay out. (*Gill, supra,* 159 Cal.App.4th at p. 161.) Beloy asserts relinquishment of the house keys was a necessary factor in *Gill* that was absent in this case.

However, relinquishing the house keys was just one of numerous factors the court considered when determining the defendant in *Gill* had waived his unconditional right to enter the home, and the court did not find it was a necessary factor. (See *Gill, supra,* 159 Cal.App.4th at p. 161.) Rather, it provided further evidence that the wife had "exerted possessory control over the . . . home to the exclusion of . . . the defendant." (*Ibid.*) Here, the testimony included that Beloy told C.T. he forgot his keys when he went to the house to get the last of his items in July. C.T. then decided to change the locks on her house because Beloy had not returned her keys. We find no meaningful distinction between asking Beloy to return his keys (which he did not have with him) and instead changing the locks as a result of his failure to do so, which had the same effect of C.T. exerting possessory control over the house to the exclusion of Beloy. (See *ibid.*) Beloy's text message on August 5 asking C.T. not to throw out two items he left behind further indicates Beloy understood he did not have an unconditional right to access to the house after he moved out. And, as in *Gill, supra,* 159 Cal.App.4th at page 161, Beloy's entry into his former home involved danger to C.T. given their estrangement, his recent threats to her in his text messages, and the prior incident of abuse that C.T. testified occurred in January.

Finally, Beloy's reliance on *Fortes v. Municipal Court* (1980) 113 Cal.App.3d 704 is unavailing. There, the court concluded a valid burglary

conviction could not be shown where a husband moved out of his family residence three weeks prior to entering because there was no suggestion the husband's access to the house was limited and the house was not the wife's separate property. (*Id.* at pp. 706, 713–714.) By contrast, here there was ample evidence from which the jury could conclude that the home was C.T.'s separate property and Beloy's access to the house was limited.

In sum, a reasonable trier of fact could find that Beloy had "abandon[ed] his unconditional possessory interest in the apartment by moving out" before August 8 (*Ulloa, supra*, 180 Cal.App.4th at p. 609) and, therefore, substantial evidence supports his burglary conviction and the burglary enhancements to the three rape convictions. (See *People v. Wilson, supra*, 44 Cal.4th at p. 806.)

## II. The Prior Assault Testimony Did Not Prejudice Beloy

Pursuant to Evidence Code sections 1108 and 1109, the parties brought pretrial motions regarding the admission of evidence of Beloy's prior acts of violence and sexual assault. The prosecution moved to admit prior evidence of a physical assault during a May 2017 incident, which the court granted, but made no mention of sexual assault during that incident. Beloy contends the court erred by denying his motion for a mistrial after C.T. testified about sexual assault related to the May 2017 incident and that the error prejudiced him. We disagree.

We review a ruling on a mistrial motion for abuse of discretion. (*People v. Bell* (2019) 7 Cal.5th 70, 121.)

A motion for mistrial should be granted where the prejudice cannot be cured by admonition or instruction; in other words, when " ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Harris* (2013) 57 Cal.4th 804, 848.) Under some circumstances,

17

volunteered testimony can result in incurable prejudice. (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.) But such testimony, particularly if not willful, can normally be cured by striking the testimony and providing an appropriate curative instruction. (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 836–837.)

## A. Additional Relevant Procedural Background

C.T. had told the police that there were "countless" unreported domestic violence incidents between her and Beloy while he lived with her. Due to lack of specificity regarding most of the incidents, the court limited the admission of evidence of prior, uncharged acts of domestic violence and sexual assault by Beloy against C.T. to two incidents. One, a May 2017 assault which was described in the incident report provided to defense counsel as Beloy holding C.T. down and hitting her arms and legs with his open palm, causing her to be badly bruised and to miss work. And two, the previously described January 2018 sexual assault incident that took place after Beloy poured water on C.T. The court indicated that it would likely strike any testimony regarding any other uncharged acts of domestic violence or sexual assault.

During C.T.'s direct examination, she was asked if there was "an incident in May of 2017 involving physical abuse." C.T. stated she and Beloy got into a fight and—when the prosecutor asked "what happened at that point,"—C.T. responded: "He was physically abusive. And he forced me to have sex with him that night." Defense counsel promptly objected that C.T.'s testimony violated the court's pretrial ruling, which limited testimony about the May 2017 incident to describing Beloy holding her down and hitting her with his palm as well as her actions after the incident, and moved for a mistrial.

18

The trial court denied the motion for mistrial, finding the testimony was not an intentional effort by the prosecutor or by C.T. to inject prohibited evidence. The court further found a curative instruction to the jury would suffice to remedy the violation, noting that the jury was also going to hear admissible testimony about the January 2018 sexual assault incident, which it found mitigated the effect of the testimony about the May 2017 sexual assault as it was "not injecting an entirely new issue into the case." The court granted defense counsel's request to strike *all* testimony about the May 2017 incident—including the physical abuse—and instructed the jury that it "may not consider testimony about that incident for any purpose."

In an April 2023 motion for a new trial, Beloy argued the trial court erred in denying his motion for a mistrial following C.T.'s testimony regarding the May 2017 incident. At a hearing on the new trial motion, the court rejected Beloy's argument. The court first noted the testimony was stricken at trial. Further, even if it was considered by the jury despite the order to disregard it, the court found it was only one sentence early in the trial and would carry de minimis weight considering the other, admissible evidence that Beloy sexually assaulted C.T. in January 2018.

**B. Analysis**

The trial court did not abuse its discretion in denying the mistrial motion. Although C.T.'s volunteered statement about the prior uncharged act of sexual assault during the May 2017 incident included the risk for prejudice, the "potential for prejudice is decreased . . . when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) After the very brief and isolated remark about the May 2017 incident, C.T. testified that Beloy forced her to have sex

19

in January 2018—which Beloy does not challenge as improperly admitted—and testified in detail about the three charged rapes in August 2018, diminishing the prejudicial effect of the improper testimony. (See *ibid.*; see also *People v. Dement* (2011) 53 Cal.4th 1, 40 [improper comment by witness not incurably prejudicial where it was brief, isolated, and "largely duplicative of evidence the jury properly received"], abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192.)

Additionally, the trial court immediately struck the testimony and instructed the jury to disregard all testimony about the May 2017 incident, and "[a] jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith." (*People v. Allen* (1978) 77 Cal.App.3d 924, 934 (*Allen*).) There is no evidence of bad faith or willfulness here by the prosecution or by C.T. as to the challenged testimony.

Beloy nevertheless contends this is one of the "exceptional case[s]" where " 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' " (*Allen, supra*, 77 Cal.App.3d at p. 935.) He relies on three cases in support of his assertion that C.T.'s testimony was incurably prejudicial, all of which are distinguishable.

First, Beloy points to *Allen*, where the appellate court found a witness's testimony that the defendant had been on parole was incurable because it was "an extremely close case." (*Allen, supra*, 77 Cal.App.3d at pp. 934–935.) The court reasoned it was "reasonably probable that a result more favorable to appellant would have been reached had . . . appellant's parole status not been divulged to the jury." (*Id.* at p. 935.) The case against Beloy was not extremely close, and a more favorable result was not reasonably probable had the testimony of the May 2017 incident not been volunteered by C.T. (Cf.

20

*ibid.*)  Beloy's only defense to the rape charges was that he and C.T. engaged in consensual make-up sex.  On the other hand, the prosecution presented evidence that Beloy sexually assaulted C.T. earlier in 2018; sent her a series of threatening text messages in the days leading up to August 8; broke into her house using a brick; dragged her back into the bedroom twice; and alternately raped and physically assaulted her throughout the night, causing extensive bruising all over her body.

Second, Beloy relies on *People v. Ozuna* (1963) 213 Cal.App.2d 338, where the prosecutor intentionally elicited improper testimony that the defendant was an ex-convict, and the appellate court concluded an admonition to the jury did not "probably" remove obvious prejudice to the defendant in light of the entire record, as the evidence of guilt was not "so strong as to preclude a finding of innocence." (*Id.* at p. 342.)  As previously explained, this was was not a close case, and there was no evidence that C.T.'s statement was intentionally elicited.  (Cf. *People v. Navarrete*, *supra*, 181 Cal.App.4th at pp. 836–837 [evidence improper statement was willful supports granting mistrial].)

Third, Beloy cites *People v. Bentley* (1955) 131 Cal.App.2d 687, disapproved of on another ground by *People v. White* (1958) 50 Cal.2d 428.  In *Bentley*, the court found incurably prejudicial a police officer's deliberate and intentional statement that the defendant was a suspect in a prior case, which caused the defendant to have to address and deny the former accusation by his own testimony.  (*Bentley*, at pp. 690–691.)  Here, the court found no bad faith or willfulness in C.T.'s testimony, a finding to which we give deference given the record before us.  Further, there was no subsequent reference to the May 2017 incident during Beloy's trial, while there was significant inculpatory evidence presented at trial.

We therefore conclude that any prejudice was cured by striking the testimony and instructing the jury to disregard it. (See *Allen*, *supra*, 77 Cal.App.3d at pp. 934–935.) We likewise reject Beloy's assertion that the alleged error was prejudicial under the standards in either *Chapman v. California* (1967) 386 U.S. 18 or *People v. Watson* (1956) 46 Cal.2d 818.

## III. The Consecutive Sentences for Rape Are Constitutional

At sentencing, the court found that the first two rapes, as charged in counts 2 and 3, occurred on separate occasions based on the evidence presented at trial. Beloy asserts the imposition of consecutive sentences of 15 years to life on those two rape counts based on that finding violated his federal Sixth Amendment right under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*) to have facts that increased his sentencing exposure found by a jury. This claim is foreclosed by *People v. Catarino* (2023) 14 Cal.5th 748 (*Catarino*).

The punishment for each of Beloy's rape convictions was 15 years to life as the jury found true that each was committed during the commission of a burglary. (§ 667.61, subds. (b) & (e)(2).) The trial court imposed mandatory consecutive sentences of 15 years to life on counts 2 and 3 pursuant to section 667.6, subdivision (d) after finding at sentencing that the first two rapes occurred on separate occasions. The court stated that, had the evidence not shown the first two rapes occurred on separate occasions, it "probably" would have run the sentences on counts 2 and 3 concurrently.[4]

Section 667.6, subdivision (d) mandates the imposition of a "full, separate, and consecutive term" of imprisonment for each of Beloy's

---

[4] The trial court exercised its discretion to run the sentence on the third rape count (count 4) concurrently to counts 2 and 3 after finding the trial evidence did not show the second and third rapes occurred on separate occasions.

convictions for rape under section 261, subdivision (a)(2) if the offenses "involve[d] the same victim on separate occasions." (§ 667.6, subds. (d)(1), (e)(1).) The sentencing judge, not the jury, makes the predicate finding of whether the offenses occurred on separate occasions for purposes of section 667.6, subdivision (d). (*Catarino, supra*, 14 Cal.5th at p. 754; see Cal. Rules of Court, rule 4.426(a)(2).)

As Beloy acknowledges, the California Supreme Court has rejected his assertion that this sentencing scheme violates *Apprendi* or *Alleyne*, because " ' "the Sixth Amendment's restriction on judge-found facts" is "inapplicable" when a trial judge makes factual findings necessary to the imposition of consecutive terms.' " (*Catarino, supra*, 14 Cal.5th at pp. 755–757; see *Oregon v. Ice* (2009) 555 U.S. 160, 170 (*Ice*).) Although he asserts *Catarino* was wrongly decided, we are bound by that precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Further, we reject Beloy's contention that the United States Supreme Court's intervening decision in *Erlinger v. United States* (2024) 602 U.S. 821 (*Erlinger*) undermines the holding of *Catarino*. In *Erlinger*, the Court concluded a defendant is entitled to have a jury determine whether his *prior* convictions occurred on distinct occasions, thereby qualifying as separate predicate convictions that increased both the maximum and minimum sentence he faced for a single new offense. (*Id.* at pp. 825, 835.) In so holding, the Court noted that case was "as nearly on all fours with *Apprendi* and *Alleyne* as any" imaginable. (*Erlinger*, at p. 835.)

By contrast, section 667.6, subdivision (d) "is distinct from the *Apprendi* line of cases, which concerns 'sentencing for a discrete crime.' " (*Catarino, supra*, 14 Cal.5th at pp. 755–756 [quoting *Ice, supra*, 555 U.S. at p. 167].) Rather, section 667.6, subdivision (d) applies only when there are

multiple convictions for which the jury's verdict already authorized the applicable minimum sentence for each count—in this case, 15 years. (*Catarino*, at pp. 755–756; see § 667.61, subds. (b) & (e)(2).)  Therefore, unlike in *Erlinger*, the jury here made the findings necessary to support the applicable sentencing range for each rape count.  (Cf. *Erlinger*, *supra*, 602 U.S. at p. 835.)  The trial court then applied section 667.6, subdivision (d) to determine "how these sentences run relative to each other, a 'sentencing function in which the jury traditionally played no part.' " (*Catarino*, at p. 755 [quoting *Ice*, at p. 163].)  Accordingly, Beloy's sentencing claim is without merit.[5]

## DISPOSITION

The judgment is affirmed.

---

[5] As we conclude Beloy's claim is unavailing, we do not reach his arguments related to harmlessness, forfeiture, or ineffective assistance of counsel.

 

 

_____

PETROU, J.


WE CONCUR:


_____

FUJISAKI, ACTING P. J.


_____

RODRÍGUEZ, J.


A168607/*People v. Beloy*